UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

CALVIN WASHINGTON,                          :

                            Petitioner,     :

         - against -                        :

DALE ARTUS, Superintendent,                 :

                            Respondent.     :

---------------------------------------------------------x

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____             │
│ DATE FILED:    3/29/13               │
└─────────────────────────────────────┘
```

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
DEBORAH A. BATTS**

07 Civ. 7769 (DAB) (FM)

**FRANK MAAS**, United States Magistrate Judge.

            Calvin Washington ("Washington") brings this habeas petition pursuant to

28 U.S.C. § 2254 ("Section 2254") to challenge his conviction, following a jury trial in

Supreme Court, Bronx County, on charges of Murder in the Second Degree and Criminal

Possession of a Weapon in the Second and Third Degrees.  On April 10, 2002, Justice

Patricia Anne Williams, before whom the case was tried, sentenced Washington to an

aggregate prison term of twenty years to life.

            In this proceeding, Washington claims that he is entitled to habeas relief

because (i) he was identified by a prosecution witness based on an unduly suggestive

lineup; (ii) the trial court improperly admitted testimony regarding gangs and alleged

gang membership; (iii) the evidence at trial was insufficient to convict him of the crimes

charged; and (iv) newly-discovered evidence establishes his actual innocence.  (See ECF

No. 20 ("Second Am. Pet." or "Second Amended Petition") ¶ 13).  For the reasons set

forth below, Washington's Second Amended Petition should be denied.  Additionally,

because Washington has not made the substantial showing of the denial of a

constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability

should not issue.

I.      Background

        A.      Trial[1]

        The charges against Washington arose out of an altercation on June 10,

2000, at the McKinley Housing Projects ("McKinley") in the Bronx, during which

Thomas Cabrera, Jr. ("Cabrera"),[2] was shot and killed.  The proof at Washington's trial,[3]

viewed in the light most favorable to the People (except where otherwise indicated),

would have enabled a reasonable juror to conclude as follows:

        The McKinley complex consists of five apartment buildings surrounding a

central area with a flagpole, playground, and benches.  (See Tr. 79-91).  The complex is

bordered by 161st Street to the north, 163rd Street to the south, Trinity Avenue to the

west, and Tinton Avenue to the east.  (Id. at 46, 86).  Members of two rival gangs, the

_____

        [1]      "Ex." refers to the exhibits annexed to the Declaration of Assistant District
Attorney T. Charles Won, dated July 21, 2011.  (ECF No. 30).  "Tr." refers to the trial transcript.
(ECF No. 33).  "H." refers to the minutes of the evidentiary hearing concerning Washington's
motion pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL").  (ECF
No. 26).

        [2]      Cabrera, whose middle name was Joseph, also was known as "Joey."  (Tr. 117).

        [3]      Prior to Washington's conviction, an earlier trial had resulted in a mistrial after
the jury was unable to reach a verdict.  (Ex. 1 at 4, Ex. 12 at 1).

2

"Latin Kings" and the "Bloods," frequented the McKinley area. (See id. at 492-97, 504-05, 519-20, 600). The Latin Kings are associated with the colors yellow and black, while the Bloods' colors are red and black. (Id. at 99, 505, 600, 604, 607).

Washington was eighteen years old in June 2000, (see id. at 348), and he had been a McKinley resident since childhood.[4] Cabrera also grew up in McKinley, but resided in the Chelsea area of Manhattan at the time of the shooting. (Id. at 78, 82, 90). The two knew each other for years and had played together when they were younger. (See id. at 84-85, 491). Weeks before the shooting, Cabrera's father, Thomas Cabrera, Sr. ("Thomas"), observed Cabrera and Washington engaged in an argument, but instructed his son to "leave it alone." (Id. at 90-95).

Although the jury did not learn the substance of the argument, Cabrera's sister, Claudia Cabrera ("Claudia"), testified that she once saw Washington make a hand sign used by the Bloods to greet other members. (Id. at 492-97, 522; see id. at 601-02). Claudia testified further that she saw Cabrera greet others with a hand gesture associated with the Latin Kings. (Id. at 503-05).

On the morning of June 10, 2000, Cabrera and his father attended the Puerto Rican Day Parade Festival in Manhattan, where they each consumed a number of beers over the course of several hours. (Id. at 115-17, 119-21).[5] Upon returning to

---

[4]     Washington also was known by the nickname "K.C." (E.g., id. at 90-91).

[5]     A toxicology examination revealed that Cabrera's blood alcohol level was 0.2 grams percent, which is consistent with approximately ten beers. (Id. at 594-95). The police also

(continued...)

McKinley at around 6 p.m., Thomas walked toward the flagpole area.  Cabrera, who was wearing a yellow tank top, a yellow and black do-rag, and a yellow handkerchief, walked behind him.  (Id. at 121-22, 126-29, 506).  As they approached the flagpole, Cabrera engaged in an argument with a young male who struck Cabrera with a wooden walking cane.  (Id. at 127, 130-31).  Cabrera then grabbed the cane and used it to strike back.  (Id. at 132).  After Thomas pulled Cabrera away, the youth fled.  (Id. at 132).  Before Thomas and Cabrera could walk away, however, they were surrounded by a large group, consisting of Black males between the ages of eighteen and twenty-one, who began to attack Cabrera.  The majority of the attackers were clad in red and black.  (Id. at 132-34).  At one point, Washington, who had been leaning on a bench near the flagpole, "ran up" to Cabrera and kicked him in the face before running in the direction of an apartment building.  (Id. at 135-36, 142-44).

Cabrera broke away from the group and ran to 161st Street, then in the direction of Tinton Avenue, with the crowd following in pursuit.  (Id. at 145).  Thomas then noticed that Washington had rejoined the group and was carrying "something in a paper bag."  (Id. at 146-47).  Shortly thereafter, Thomas heard a gun shot.  As the people that had gathered around his son scattered, Thomas saw someone standing over Cabrera's body fire two additional shots.  (Id. at 150-151).  As Thomas ran to his son, the gunman

---

[5](...continued)
vouchered an empty small liquor bottle as part of Cabrera's property.  (Id. at 252).

4

turned and pointed his weapon at Thomas momentarily before running away down Tinton.  (Id. at 152-53).

At trial, Thomas testified that he saw the shooter's face and recognized him as Washington, but explained that he did not give that name to the police officers responding to the scene because he did not recall Washington's name at the time.  (Id. at 152-53, 160).  Instead, he merely described the shooter as a Black male who was five feet nine inches tall and weighed around 185 pounds.  (Id. at 242).  Although Thomas testified that Washington was wearing a red shirt and black pants on the day of the shooting, he acknowledged having told police at the scene that the shooter wore blue denim shorts and a blue shirt with the number "07"on it.  (Id. at 143, 160-61, 173-74; see id. at 242).  Thomas also admitted later telling a defense investigator that he had not seen the person who shot his son and "didn't care" whether Washington was the shooter, but that "somebody had to pay" for his son's death.  (Id. at 176-77).  Thomas explained that he had lied to the investigator because he "did not care" what the investigator thought. (Id. at 177).

At the time of the shooting, Manuel Medina ("Medina"), a cab driver, was dropping off a passenger at 161st Street and Trinity.  He observed a large group in the middle of the street chasing and attacking a man later identified as Cabrera.  (Id. at 632-33, 663).  After Medina's passenger disembarked, Medina followed the crowd in his cab before stopping at a red light at the intersection of 161st Street and Tinton.  (Id. at 625-27, 630).  There, Medina observed Cabrera on the ground while the crowd continued to beat

him.  A Black male wearing a blue shirt with the number "07" on it "suddenly" ran past Medina's cab, pushed the crowd to the side, and shot Cabrera multiple times.  (Id. at 630-31, 634-35, 672).  After standing over the body for a few moments, the shooter crossed in front of Medina's cab.  The shooter then walked away with two other individuals "like nothing happened" and entered a building.  (Id. at 635, 638, 675).  Medina described the shooter to police officers as five foot nine inches tall and weighing around 185 pounds.  (Id. at 687).  Approximately two months later, he identified Washington as the shooter after viewing a police lineup.  (Id. at 647-49).

Reverend Wallace Diamond ("Diamond") lived in a second floor apartment in Washington's building.  (Id. at 260, 264).  Diamond knew Washington from the neighborhood.  (Id. at 261-62).  On the day of the shooting, Diamond was in his bedroom, which faced 161st Street and Tinton, when he heard gunshots.  He waited thirty seconds before looking out his window, at which point he observed a group of people running toward the back of his building.  Diamond noticed Washington in the group, in part because Washington was wearing neither a shirt nor shoes.  (Id. at 264-65).  In his hand, Washington was carrying slippers and a red bandana that concealed all but the tip and handle of a black gun.  (Id. at 265-67).  Washington and the others then entered Diamond's building through the back door.  (Id. at 268).  After viewing the same lineup as Medina, (see id. at 647), Diamond also identified Washington as the person he saw carrying the gun.  (Id. at 276).

On the afternoon of the shooting, Lisa Aldea ("Aldea") was at a park at the center of McKinley with her three young children and others.  (Id. at 531-33).  At some point, Aldea went to a store near 161st Street and Tinton to purchase food.  (Id. at 533-34).  As she was leaving the store, Aldea saw Cabrera running down the street, trailed by a large group.  (Id. at 536-38).  She returned to her family, grabbed her daughter and her stroller, and began to walk away.  She had walked just a few feet when she heard gun shots and began to run toward building number 730.  (Id. at 544-45).  When she arrived, after only ten seconds or so, Washington was already standing in front of the building.  (Id. at 546, 549).  Washington, who was out of breath, asked Aldea to let him into the locked building, which she did.  (Id.).

On August 16, 2000, Washington was interviewed at a nearby police precinct.  (Id. at 348).  After being given Miranda warnings, Washington gave written and videotaped statements.  (Id. at 361, 367-70, 380).  In those statements, Washington claimed that he was not a member of a gang, and that although he had known Cabrera since they were children, he did not "hang with him at all," and did not know if he was in a gang.  (Id. at 370).  Washington explained that on the day of the shooting, he visited his girlfriend and daughter at his girlfriend's apartment in Building 730 at McKinley around noon.  After about an hour, he went to a nearby grocery store.  (Id. at 367).  On his way back to his girlfriend's building, Washington saw Cabrera "fighting with a black kid" "over a black cane," and moved closer for a better view.  Approximately thirty-five other people also were watching the fight.  At one point, "an older Spanish lady" grabbed

7

Washington, ripping his white t-shirt.  (Id. at 368).  Washington then moved away and

continued to observe the fight while leaning on a gate close to the flagpole.  (Id. at 368-

69).  When others stepped in to break up the fight, Washington resumed walking to his

girlfriend's building.  As he was entering her building, he heard a gunshot.  Washington

also saw people running, but did not see who shot Cabrera or anyone with a gun.

Washington then ran to his girlfriend's apartment. (Id. at 369).

      B.    Subsequent Procedural History

          1.    Direct Appeal

On June 30, 2005, Washington appealed to the Appellate Division, First

Department.  In his counsel's brief, Washington argued that:  (a) the jury's verdict was

against the weight of the evidence; (b) Washington was denied due process and a fair trial

because (i) Medina's identification of him was the product of an impermissibly

suggestive lineup, and (ii) the trial court had admitted evidence concerning uncharged

allegations of gang violence; and (c) his sentence was excessive.  (Ex. 1).  Washington

also submitted a pro se supplemental brief in which he contended that (a) the evidence

was insufficient to support the verdict, and (b) he was denied a fair trial due to the

prosecution's introduction of prejudicial and irrelevant testimony regarding gang

membership and the court's improper jury instructions.  (Ex. 2).

By order dated April 18, 2006, the Appellate Division, First Department,

affirmed Washington's conviction.  People v. Washington, 812 N.Y.S.2d 525 (1st Dep't

2006).  In its decision, the Appellate Division first found that the "verdict was not against

the weight of the evidence," and that there was "no basis for disturbing the jury's credibility and identification determinations." Id. Next, the court rejected Washington's argument that the lineup was unduly suggestive, observing that the lineup participants were "generally similar in appearance" and "varied in age, body type and facial hair" such that Washington "was not singled out." Id. The court also noted the lack of evidence that the witnesses' descriptions of the shooter reflected any of the differences that Washington considered significant between his own appearance and that of the fillers. See id.

Turning to the admission of testimony relating to gangs, the court concluded that the trial "court properly exercised its discretion in admitting limited evidence regarding indicia of [Washington]'s and [Cabrera]'s memberships in rival gangs," reasoning that the evidence was not "unduly remote or speculative," and "was probative of [Washington's] motive for an otherwise inexplicable murder." The court further observed that any potential for prejudice was minimized by Justice Williams' limiting instruction. Id.

The court also found that there was no basis for reducing Washington's sentence. Id.

Finally, the court noted that Washington's pro se claims were unpreserved and declined to review them in the interest of justice. The court also observed, however, that were it to review those claims, it "would reject them." Id.

By letter dated May 19, 2006, Washington's appellate counsel sought leave to appeal to the Court of Appeals.  (Ex. 5).  In a follow-up letter to Judge Rosenblatt of the Court of Appeals, dated June 15, 2006, counsel pressed Washington's claims that (a) the lineup procedure used to identify Washington was unduly suggestive; (b) the conviction was against the weight of the evidence; (c) evidence of gang affiliation had been improperly received; and (d) the sentence should have been reduced.  (Ex. 6 at 1-2, 10-12).  By summary order dated August 4, 2006, Judge Rosenblatt summarily denied Washington's application.  See People v. Washington, 12 N.Y.3d 819 (2006).

2.    Motion to Vacate the Judgment

On July 18, 2008, Washington's appellate counsel filed a motion pursuant to CPL § 440.10 seeking to vacate his conviction on the basis of newly-discovered evidence.  That evidence consisted of sworn statements from three individuals who claimed that Washington did not shoot Cabrera, and that another person was responsible for the crime.  (Ex. 8).

In 2009, Justice Joseph J. Dawson of Supreme Court, Bronx County, presided over an evidentiary hearing at which the three witnesses testified.  Justice Dawson sealed the record of the hearing, but permitted it to be unsealed for the limited purpose of this Court's review of Washington's habeas petition.  To ensure the continued safety of the three witnesses who implicated someone else as the shooter, I will refer to the witnesses only as Witnesses A, B, and C, and the alleged other shooter as "X."

10

Witness A claimed to have been at the scene of the shooting in June 2000, where Witness A observed X shoot Cabrera.  (H. 34-36).  Witness A was a McKinley resident and had known both Washington and X for many years.  (Id. at 35, 37).  According to Witness A, all three were members of the Bloods gang.  (Id. at 41, 42, 59-60).  On the afternoon of the shooting, Witness A and a friend were in an apartment, when they heard noises outside and saw a large crowd gathered.  (Id. at 37-38).  After going downstairs, they saw a group "jumping" Cabrera, whom Witness A knew from the neighborhood.  (Id. at 36, 38).  Witness A moved closer to the fight and observed Washington hitting Cabrera.  (Id. at 43).  Indeed, Witness A joined the chase when Cabrera ran down 161st Street.  X, who was wearing a black hoodie and jeans, then "came out of nowhere" and shot Cabrera.  (Id. at 45-46, 60).  Following the shooting, X, Washington, and others ran in the direction of Washington's building while Witness A remained near Cabrera for around twenty minutes.  (Id. at 63, 67, 225-28).

Although Witness A visited and had telephone conversations with Washington while he was awaiting trial, the two of them allegedly never spoke about the shooting because Washington "was a trooper" who did not talk about the case.  (Id. at 67-68, 271).  However, Witness A admitted having placed calls to Washington's lawyer posing as Washington's relative.  During those calls, Witness A told Washington's attorney that Washington was innocent, but did not disclose that X shot Cabrera because Witness A "didn't really want anything to do with it."  (Id. at 69).  After Washington was

11

convicted, Witness A sent letters to Washington promising to help him get out of jail. (Id. at 85, 90).

Several years later, Witness A told a detective that X was the shooter because "it was time for the truth to come out."  (Id. at 72-73, 82).  At the time of the hearing, Witness A was serving a prison sentence.  (Id. at 32, 90).  Witness A also previously had been convicted of other crimes.  (Id. at 83, 86-87).

Witness B testified that he lived in the McKinley vicinity and spent his time "hanging out" there when not selling drugs.  (Id. at 325-26).  He and Washington had been friends for several years, based upon which Witness B knew that Washington was a member of the Bloods.  (Id. at 410-11).  On the day of the shooting, Witness B sat on benches in the middle of McKinley with others and smoked marijuana and drank alcohol. (Id. at 338, 414, 418-20, 517, 548).  In the early afternoon Washington joined the group, and also smoked marijuana and drank alcohol.  (Id. at 419).  Later that day, Witness B observed "a Spanish kid," later identified as Cabrera, walk into McKinley with a red flag affixed to the bottom of a wooden cane, which signaled "something foul to the Bloods . . . like disrespecting them."  (Id. at 326-27, 434).  Cabrera then got into an argument with another youth and was "jumped" by several Bloods gang members.  (Id. at 327, 335, 337).  Washington "looked like he wanted to get up" and fight, but Witness B testified that he told him to sit down, reminding him that he had "just had a baby."  Accordingly, Washington "just sat back down and watched the fight."  (Id. at 358).  After Cabrera fled down 161st Street, Witness B and Washington walked to the "front" of McKinley and

12

watched as the group beat Cabrera.  (Id. at 327).  Witness B then observed X approach the group, and heard two gunshots a "couple of seconds" after X reached them.  (Id. at 349, 505).  Witness B did not see a gun or who shot Cabrera, but was certain that Washington had stayed beside him throughout these events.  (Id. at 352-53, 495, 498, 504).  After hearing the shots, Witness B returned to the benches and Washington walked to his girlfriend's home.  (Id. at 345, 512-13).

Witness B first recounted this version of the incident to law enforcement when he entered into an agreement with federal authorities as part of his guilty plea to unrelated charges.  (Id. at 318-19, 363).  Prior thereto, Witness B "didn't think it was [his] business."  (Id. at 362).  Witness B understood, however, that his cooperation might redound to his benefit in connection with his criminal case.  (Id. at 319-20).

Witness C was a sentenced inmate who also had prior convictions.  (Id. at 625-26, 657).  Witness C was "from" the McKinley area and knew both Washington and X.  (Id. at 627-30).  Although Witness C did not observe the shooting, he claimed that X had confessed to him on several occasions.  (Id. at 625-28, 632-37, 657-69).  On one such occasion, X said that he had shot a Puerto Rican "kid" who had a cane and a "red flag tied to his sneaker," which indicated "disrespect to the Bloods."  (Id.).  X told Witness C during that discussion that he "shot the kid in the chest and stood over him and hit him again."  (Id. at 630-40, 725-26).  Witness C told prosecutors about his conversations with X several years later because he had agreed to cooperate with them.  (See id. at 649-50).

Justice Dawson denied Washington's motion on June 30, 2010.  (Ex. 12).

As Justice Dawson explained in his Sealed Decision and Order, CPL § 440.10(1)(g)

enables a defendant to secure the vacatur of a judgment of conviction when:

> New evidence has been discovered since the entry of a
> judgment based upon a verdict of guilty after trial, which
> could not have been produced by the defendant at the trial
> even with due diligence on his part and which is of such
> character as to create a probability that had such evidence
> been received at the trial the verdict would have been more
> favorable to the defendant; provided that a motion based upon
> such ground must be made with due diligence after the
> discovery of such alleged new evidence.

(Id. at 15) (quoting CPL § 440.10(1)(g)).  Thus, three of the six factors that a defendant

must establish to prevail on such a motion are that the evidence "[a] will probably change

the result if a new trial is granted; [b] is discovered since the previous trial; [and] [c] was

not discoverable before the trial by the exercise of due diligence."  (Id. at 16) (quoting

People v. Reyes, 680 N.Y.S.2d 493, 494 (1st Dep't 1998), leave to appeal denied, 92

N.Y.2d 1053 (1999)).  Justice Dawson found that "[n]one of these three factors [was]

satisfied" by Washington's evidentiary showing.  (Id.).

Turning first to the probability that a retrial would result in a different

verdict, Justice Dawson found that the testimony of the hearing witnesses was "not

credible" and "not persuasive, individually or collectively."  (Id. at 2, 9, 12, 15).  For

example, Justice Dawson noted that Witness A's credibility was undermined by the

witness's numerous felony convictions, gang membership, and friendship with

Washington.  (Id. at 9).  The Justice further found Witness A's demeanor, particularly

when speaking about the Bloods, "evasive and defensive." (Id.). Perhaps most importantly, the Justice observed that Witness A's testimony was not corroborated by the trial evidence. For instance, Witness A testified that X was wearing a black hoodie when he shot Cabrera, which conflicted with trial testimony that the gunman wore a blue shirt with a number "07." Justice Dawson also found it "implausible" that Witness A did not testify at the trial for fear of getting involved, yet had spoken several times with Washington and his attorney, had visited Washington in jail, and had attended his trial. (Id.).

Justice Dawson similarly found Witness B not credible because, among other things, he had "an extensive criminal record," was "an admitted drug dealer," and considered himself Washington's friend. (Id. at 12-13). Justice Dawson also found that Witness B's testimony was "simply implausible" because the notion that a felon and drug dealer would stop a gang member from participating in a fight alongside his fellow gang members was "unlikely on its face, and . . . not corroborated by the trial evidence or other evidence from the evidentiary hearing." (Id. at 12). As Justice Dawson explained, the "whole story" struck him as "fabricated" because it was "uncorroborated, exonerate[d the] defendant, [did] not expressly implicate anyone else, and cast[] the witness in an absurdly good light." (Id. at 13).

Finally, Justice Dawson questioned Witness C's credibility because, among other things, Witness C was Washington's friend, had "an extensive criminal record[,] and [was] an admitted drug dealer." (Id. at 15). The Justice also expressed doubt that X

15

would "repeatedly confess" his involvement in the crime to Witness C.  (Id.).  Justice

Dawson further noted that Witness C's demeanor was evasive, noting that he had

repeatedly invoked the Fifth Amendment during his testimony.  (Id.).

      In addition to questioning the credibility of each of the hearing witnesses,

Justice Dawson concluded that their testimony "probably [would] not change the result if

a new trial is granted," because it "was in sharp conflict as to what [Washington] was

doing, who he was with, and where he was."  (Id. at 16).  For example, Justice Dawson

noted that the "two versions of the critical events leading up to the murder [offered by

Witness A and Witness B] are irreconcilable, and defense counsel cannot reconcile them

in any meaningful way."  (Id. at 16-17).  Justice Dawson also found unpersuasive Witness

C's testimony that X had confessed to the murder because "it defies credibility [sic] that

[X] repeatedly told [Witness C] he was the killer" and because "details in the alleged

confessions are inconsistent with the trial testimony."  (Id. at 17).

      Justice Dawson also rejected Washington's contention that the evidence

adduced at trial was weak, concluding, to the contrary, that there "was considerable" trial

testimony indicating that Washington shot Cabrera.  (Id. at 18).  The Justice noted that

Thomas, who knew Washington, testified that Washington shot his son, and that it was

within the jury's province to credit Thomas' testimony that he previously had lied when

he told an investigator that he did not know the identity of the shooter.  The Justice

further noted that Medina had identified Washington in a lineup as the person who shot

Cabrera, and that Diamond had identified him in the lineup as the person he saw fleeing with a gun.

Additionally, Justice Dawson concluded that certain inconsistencies in the testimony of the trial witnesses cited by Washington did not provide a basis to vacate the conviction.  (Id.).  The Justice also noted that the jury was entitled to believe that Aldea might have taken longer than ten seconds to run to her building since she had three children with her, thereby affording Washington sufficient time to run there after the shooting.  As Justice Dawson noted, it was not sufficient for Washington to show merely that it was "possible" that the newly discovered evidence would have changed the verdict. Rather, to prevail, Washington had to show that a different verdict was "probable."  (Id. at 19 (citing CPL § 440.10(1)(g)).  Justice Dawson found that, "[d]ue to the conflicts contained in the testimony presented at the evidentiary hearing and the unbelievable testimony of the witnesses," Washington had not met this burden.  (Id.).

Turning to the second of the required factors, Justice Dawson concluded that the testimony of Witnesses A and B, if true, was known to Washington prior to trial and thus did not constitute newly-discovered evidence.  (Id. at 19-20 (citing, inter alia, People v. Moore, 537 N.Y.S.2d 691 (4th Dep't 1989)).  Indeed, in his opening statement, Washington's defense counsel had expressly stated that X was "the actual shooter" (using X's real name).  (See Ex. 10 at 8 (quoting Tr. at 27)).  Considering that no witness so testified for the defense, Justice Dawson concluded that "the most likely explanation for this" was that defense counsel made a "considered decision not to call such a witness or

17

witnesses as part of a reasonable trial strategy to keep the felons, Bloods gang members, and drug dealers with whom [Washington] was associated away from the jury despite the remote chance that their conflicting and unbelievable testimony <u>might</u> help [Washington]."  (<u>Id.</u> at 20-21) (emphasis in original).

Justice Dawson further rejected Washington's argument that the testimony of Witnesses A and B could not have been produced at trial because they were gang members or drug dealers who did not want to get involved, noting that "steps could have been taken to secure their testimony," and that there was no evidence that such steps were taken.  (<u>Id.</u> at 21).  For instance, Justice Dawson noted the absence of any "evidence that they were asked to testify and refused, were subpoenaed and failed to comply, or that a material witness order was sought."  (<u>Id.</u>).  The Justice also noted that Washington could not demonstrate that he exercised due diligence to secure Witness A's testimony because the witness and Washington apparently collaborated to keep the details of the shooting secret out of a desire to shield X, who was a fellow gang member.  (<u>Id.</u> at 22 (citing <u>People v. Messina</u>, 424 N.Y.S.2d 219, 220 (1st Dep't 1980))).

Finally, Justice Dawson rejected Washington's attempt to rely on X's alleged confessions to Witness C because there was no showing that X was unavailable and that the surrounding circumstances confirmed the trustworthiness and reliability of his alleged declarations against interest.  (<u>Id.</u> at 23).  Justice Dawson held that, absent such proof, X's statements to Witness C were inadmissible hearsay and, therefore, not something that could be considered in connection with Washington's motion.  (<u>Id.</u>).

On November 9, 2010, Justice Leland G. DeGrasse of the Appellate Division, First Department, denied Washington's application for leave to appeal from the denial of his CPL § 440.10 motion. (Won Decl. ¶ 16).

3.   Habeas Petition

Washington filed a timely habeas petition on August 31, 2007. (ECF No. 1). On June 13, 2008, Washington filed an Amended Petition. (ECF No. 7). By memo endorsement dated August 20, 2008, Your Honor then stayed this proceeding so that Washington could pursue his CPL § 440.10 motion in state court. (ECF No. 9). Following the resolution of that motion, Washington filed his Second Amended Petition on February 2, 2011. (ECF No. 20). I subsequently granted, in part, the Respondent's request to file his papers under seal, directing that the publicly filed papers not disclose the identity of the witnesses who testified at the Section 440.10 hearing.[6] Washington then filed a reply on September 13, 2011. (ECF No. 31).

In his Second Amended Petition, Washington claims that he is entitled to habeas relief because (a) he was identified by Medina based on an unduly suggestive lineup; (b) the trial court improperly admitted testimony regarding gangs and alleged gang membership; (c) the evidence at trial was insufficient to convict him of the crimes charged; and (d) newly discovered evidence establishes his actual innocence. (See Second Am. Pet. ¶ 13). As set forth below, none of these contentions withstands scrutiny.

---

[6]     In my memorandum endorsement, I suggested that the witnesses be "identified as Witnesses A, B, and C" so that redactions could be kept to a minimum. (ECF Nos. 25, 30).

II.      Discussion

    A.      Standard of Review

    A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Rather, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).  Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

    As the Second Circuit noted in Jones v. Stinson, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'"  229 F.3d 112, 119 (2d Cir. 2000).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a

20

case differently than [the] Court has on a set of materially indistinguishable facts."
Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application"
clause, a federal habeas court should "ask whether the state court's application of clearly
established federal law was objectively unreasonable."  Id. at 409.  This standard does not
require that reasonable jurists all would agree that the state court was wrong.  Id. at 409-
10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable
to all reasonable jurists.'"  Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d
100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ
when a claim considered on the merits in state court "resulted in a decision that was based
on an unreasonable determination of the facts in light of the evidence presented in the
State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings,
Section 2254(e)(1) provides that "a determination of a factual issue made by a State court
shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting
the presumption of correctness by clear and convincing evidence."  "If, after carefully
weighing all the reasons for accepting a state court's judgment, a federal court is
convinced that a prisoner's custody . . . violates the Constitution, that independent
judgment should prevail."  Williams, 529 U.S. at 389.

B.     Merits of Washington's Claims

1.     Unduly Suggestive Lineup

Washington first claims that Medina's identification of him was the product of an unduly suggestive police lineup.  (Second Am. Pet. (Ground One)).[7]  Specifically, Washington contends that he was visibly younger, shorter, and smaller than the fillers, and that he was the only participant wearing handcuffs.  (Id.).

The Due Process Clause of the United States Constitution prohibits the introduction of identifications procured by means of "unduly suggestive" lineups, but "does not require that an accused be surrounded at a line-up by persons nearly identical in appearance."  Love v. Kuhlman, No. 99 Civ. 11063 (DLC) (RLE), 2001 WL 1606759, at *7 (S.D.N.Y. Dec. 12, 2001) (citing United States v. Reid, 517 F.2d 953, 965 n.15 (2d Cir. 1975)); see also Espiritu v. Haponik, No. 05 Civ. 7057 (RJS), 2012 WL 161809, at *6 (S.D.N.Y. Jan. 19, 2012) ("Due process does not require total uniformity of appearance between the defendant and the other participants in the lineup.") (internal quotation marks omitted); Roldan v. Artuz, 78 F. Supp. 2d 260, 271 (S.D.N.Y. 2000) ("Police stations are not theatrical casting offices; a reasonable effort to harmonize the line-up is normally all that is required.") (internal quotation marks and citation omitted).

---

[7]     Washington does not advance a similar claim with respect to the lineup identification made by Diamond, nor could he since the evidence established that Diamond knew Washington for over three years.  (Tr. 262).  Cf., e.g., United States v. Ming, 02 Cr. 0596 (LAK), 2002 WL 1949227, at *1 (S.D.N.Y. Aug. 22, 2002) ("[T]he witness knew the defendant from prior encounters . . . , thus raising substantial doubt as to whether any suggestiveness of the procedure was undue.").

Thus, "even a suggestive out-of-court identification will be admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability." United States v. Mohammed, 27 F.3d 815, 821 (2d Cir. 1994) (quoting United States v. Simmons, 923 F.2d 934, 950 (2d Cir. 1991)); see also Manson v. Brathwaite, 432 U.S. 98, 114 (1977) ("reliability is the linchpin in determining the admissibility of identification testimony").

To prevail on his lineup claim, Washington consequently must establish that the pretrial identification procedures were so suggestive that they created "a very substantial likelihood of irreparable misidentification." Neil v. Biggers, 409, U.S. 188, 198 (1972); Simmons v. United States, 390 U.S. 377, 384 (1968); Mohammed, 27 F.3d at 821. The factors that a court must consider in determining the likelihood that the defendant was misidentified include "[a] the opportunity of the witness to view the criminal at the time of the crime, [b] the witness' degree of attention, [c] the accuracy of the witness' prior description of the criminal, [d] the level of certainty demonstrated by the witness at the confrontation, and [e] the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199-200. "A good or poor rating with respect to any one of these factors will generally not be dispositive." United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992). Rather, "[i]n each case, the factors must be assessed in light of the totality of the circumstances." Id. at 378.

Here, all of the Biggers factors weigh against Washington's lineup claim. Among other things, Medina had a good opportunity to view Washington at the scene of

the crime, as the shooting occurred near his cab in daylight, and Medina viewed the

gunman attentively as the crowd dispersed and the gunman crossed in front of his car.

(Tr. 634-35, 638, 673-75).  Medina's description of the gunman as approximately twenty

years of age, five feet nine inches tall, and 185 pounds, also generally matched

Washington.  In addition, Medina confidently and quickly identified Washington at the

lineup, which was conducted on August 17, 2000, only around two months after the

incident.  (Id. at 647, 649).  Photographs of the lineup submitted to this Court under seal

further confirm the accuracy of the Appellate Division's finding that the lineup

participants "were generally similar in appearance, [but] varied in age, body type and

facial hair, so that [Washington] was not singled out."  Washington, 812 N.Y.S.2d at 526.

Any height differential appears to be slight and was substantially minimized because the

individuals were seated.  See Roldan v. Artuz, 78 F. Supp. 2d at 272-73 (S.D.N.Y. 2000).

In addition, because the hands of the lineup participants were covered by a white sheet,

Washington's claim that the lineup was suggestive because he was the only individual in

handcuffs clearly is frivolous.

       Nor does the detective's statement to Medina that a suspect was in custody,

(see Tr. 385), render the lineup unduly suggestive, as Washington contends.  See Piper v.

Portuondo, 82 Fed. App'x 51, 52 (2d Cir. 2003).  Indeed, because "it is implicit in the

viewing of a lineup that a suspect might appear," "such information does not predispose

the viewer of a lineup to select any particular person when the lineup . . . was otherwise

proper."  Hodge v. Henderson, 761 F. Supp. 993, 1007-08 (S.D.N.Y. 1990); accord Green

v. Connell, No. 05-CV-5975 (CBA), 2006 WL 3388656, at *8 (E.D.N.Y. Nov. 21, 2006)

("Neither the Supreme Court nor the Second Circuit has ever held that such a statement

renders a line-up impermissibly suggestive.").

Washington consequently has failed to demonstrate that the lineup

procedures in this case were so suggestive that they created "a very substantial likelihood

of irreparable misidentification."  Mohammed, 27 F.3d at 821 (quoting Simmons, 390

U.S. at 384).

### 2.    Admission of Evidence Relating to Gangs

Washington further contends that the trial court erred by admitting "highly

prejudicial" evidence regarding gangs "without establishing a foundation" or weighing

the "relevance of the testimony against it[]s prejudicial impact."  (Second Am. Pet.

(Ground Two)).  At the trial, Claudia testified that she saw Cabrera and Washington

making gang signs, and a Correctional Officer testified regarding gang customs, including

gang colors and signs.  Washington argues that this evidence gave rise to an inference that

he and Cabrera were members of rival gangs and that the shooting was gang-related,

causing the jury to be "distracted" and "feel fear and/or animosity toward petitioner" and

to believe that he had a criminal predisposition.  (Id.)

Under both federal and New York law, evidence of prior crimes and bad

acts may not be admitted solely to show that a defendant has a propensity for criminal

activity.  See Fed. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not

admissible to prove a person's character in order to show that on a particular occasion the

person acted in accordance with the character."); <u>People v. Rojas</u>, 97 N.Y.2d 32, 36

(2001) ("[A] criminal case should be tried on the facts and not on the basis of a

defendant's propensity to commit the crime charged.").  On the other hand, both

jurisdictions permit such evidence to be introduced when it is relevant to an issue other

than criminal propensity.  <u>See</u> Fed. R. Evid. 404(b)(2) ("This evidence may be admissible

for another purpose, such as proving motive, opportunity, intent, preparation, plan,

knowledge, identity, absence of mistake, or lack of accident.); <u>United States v. Gelzer</u>, 50

F.3d 1133, 1139 (2d Cir. 1995) ("Rule 404(b) does not bar all other crime evidence; it

bars only the admission of a defendant's uncharged crimes to prove propensity to commit

the crime charged.") (internal quotation marks omitted); <u>People v. Allweiss</u>, 48 N.Y.2d

40, 47 (1979) ("When evidence of uncharged crimes is relevant to some issue other than

the defendant's criminal disposition, it is generally held to be admissible on the theory

that the probative value will outweigh the potential prejudice to the accused.").

In its decision rejecting Washington's claim, the Appellate Division

observed that the evidence concerning Washington's and Cabrera's membership in rival

gangs was properly admitted because it was not "unduly remote or speculative."

<u>Washington</u>, 812 N.Y.S.2d at 526.  Indeed, Thomas testified that his son was wearing

yellow and black on the day of the shooting, and that most of the members of the group

that attacked him were wearing red and black.  A yellow tank top and yellow do-rag

found by police at the scene further corroborate that testimony.  (<u>Id.</u> at 47, 60-62).

Additionally, Diamond testified that he observed Washington running with a red bandana

and a gun in his hand shortly after the shooting.  In light of this testimony, the trial court did not act unreasonably in admitting testimony explaining that these colors were associated with the Latin Kings and the Bloods, and that Claudia had seen Cabrera and Washington display hand signs used by those gangs.  As the Appellate Division correctly found, this evidence of gang membership was, instead, "probative of [Washington's] motive for an otherwise inexplicable murder."  Washington, 812 N.Y.S.2d at 527.

Contrary to Washington's contention that the trial court failed to weigh the probative value of the testimony against its prejudicial impact, Justice Williams conducted an extensive colloquy after defense counsel objected to the proposed testimony.  (Tr. at 461-82; 560-68).[8]  Justice Williams ruled that testimony regarding gang colors and signals was permissible, but recognized that the evidence was "fairly volatile" and indicated that she would rule on each question as it was posed.  She further cautioned the prosecution that the testimony needed to be "more directed."  (Id. at 479, 482).  The Justice then considered each objection individually and actively controlled the questioning of the witnesses regarding gangs.  (See id. at 485-529, 556-58, 595-608).

On this record, the Appellate Division properly held that the trial court acted within its discretion in finding that the probative value of the evidence outweighed its prejudicial effect.  Washington, 812 N.Y.S.2d at 527.  The Appellate Division also correctly held that the "court's limiting instruction minimized the potential for prejudice."

---

[8]  These exchanges occurred mid-trial because defense counsel initially had indicated that he would not contest rulings made by the judge in the previous trial, which included a ruling allowing the testimony regarding gangs.  (See Tr. at 482).

Id.  Indeed, Justice Williams asked counsel to submit appropriate requests to charge concerning the gang evidence, (Tr. at 560), and Washington does not dispute that the jury was given limiting instructions.[9]  In the absence of any evidence to the contrary, the jury must be presumed to have followed those instructions.  Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993).

In any event, even if the trial court should have precluded any discussion of alleged gang customs and membership, and the jury improperly treated that evidence as probative of Washington's propensity for violence, the Supreme Court expressly has declined to resolve whether the use of "prior crimes or bad acts" to show criminal propensity violates Due Process.  See Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991). "Thus, since the Supreme Court has taken no position on the issue, it would be impossible for [a district court] to make the determination required under § 2254(d), namely that the state court decision violated 'clearly established Federal law as determined by the Supreme Court of the United States.'"  Roberts v. Phillips, 03-CV-2957 (NGG), 2004 WL 502920, at *3 (E.D.N.Y. Feb. 2, 2004); see also Allaway v. McGinnis, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004) ("[T]he Supreme Court has not yet clearly established when the admission of evidence of prior crimes under state evidentiary laws can constitute a federal due process violation.") (citing Estelle, 502 U.S. at 67-68).

---

[9]      Although the trial transcript furnished to the court does not contain the jury charge, defense counsel conceded that the instructions at the previous trial were appropriate.  (Id. at 566).

Washington's claim relating to the allegedly improper admission of evidence concerning gangs and gang membership consequently must be denied.

        3.      Sufficiency of the Evidence

Washington further contends that the evidence was "wholly insufficient to permit a jury to find [him] guilty beyond a reasonable doubt." (Second Am. Pet. (Ground Three)). The Appellate Division concluded that Washington's pro se sufficiency of the evidence claim was unpreserved, but also noted that "[w]ere [it] to review these claims, [it] would reject them." Washington, 812 N.Y.S.2d at 527.[10]

A federal court reviewing the sufficiency of the evidence underlying a state court criminal conviction must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979). To prevail, the petitioner must show that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Einaugler v. Sup. Ct. of the State of N.Y., 109 F.3d 836, 839 (2d Cir. 1997); Bossett v. Walker, 41 F.3d 825, 830 (2d Cir. 1994) (quoting Jackson, 443 U.S. at 324). In determining whether this standard has been met, a habeas court must view the evidence in the light most favorable to the prosecution and draw all permissible inferences in its favor. Jackson, 443 U.S. at 319. A petitioner

---

[10]      The Respondent contends that this claim is unexhausted because Washington failed to ask the New York Court of Appeals to review it, and procedurally barred because the Appellate Division denied it based on an adequate and independent state ground. (ECF No. 30 ("Resp't Mem.") at 3-8). Because the claim clearly fails on its merits, I have not addressed these issues in this Report and Recommendation.

challenging the sufficiency of the evidence therefore bears a "very heavy burden." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002).

In determining the sufficiency of the evidence underlying a state court conviction, a federal court "must look to state law to determine the elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999); see Jackson, 443 U.S. at 324 n.16; DiGuglielmo v. Smith, 366 F.3d 130, 137 (2d Cir. 2004). In this case, the applicable state law is the New York Penal Law ("PL"). As noted above, Washington was convicted on one count of Murder in the Second Degree. To establish his guilt on this count, the People had to establish that "with intent to cause the death of another person, he cause[d] the death of such person." PL § 125.25(1). Washington also was convicted on related weapons charges – Criminal Possession of a Weapon in the Second and Third Degrees – in connection with his use of a firearm to shoot Cabrera. See id. at §§ 265.02, 265.03. Contrary to Washington's claim, the People produced sufficient evidence for the jury to find Washington guilty on all three counts. Medina, an impartial witness who observed the shooting and saw the shooter flee the scene, identified Washington as the shooter in a lineup conducted only a little over two months after the shooting. (Tr. 630, 635, 649). This alone was sufficient evidence for the jury to convict Washington. It was, however, scarcely the only evidence. Diamond, who had known Washington for years, also identified Washington in that lineup as the person he saw running into his building with a partially concealed gun shortly after he heard gunshots.

30

(Id. at 265-68).  Similarly, Thomas, who knew Washington from childhood, testified that it was Washington who shot his son.  (Id. at 150-53).

There admittedly were inconsistencies among the witnesses as to what the gunman was wearing and the path he took after shooting Cabrera.  Thomas' statements to the defense investigator also are, at a minimum, troublesome.  However, drawing all inferences in favor of the prosecution, the Court clearly cannot say that a rational trier of fact would have been unable to convict Washington on the murder and related weapons charges.  There consequently is no basis to disturb the jury's verdict based on the alleged insufficiency of the evidence.

4.    Actual Innocence

Finally, Washington contends that "newly discovered evidence," in the form of the testimony of Witnesses A, B, and C, "establishes that [he] was wrongfully convicted." (Second Am. Pet. (Ground Five)).  However, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  Herrera v. Collins, 506 U.S. 390, 400 (1993); see also Dist. Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 71 (2009) ("Whether such a federal right exists is an open question.  We have struggled with it over the years . . . .").  Thus, to the extent Washington "has alleged a freestanding 'actual innocence' claim, such a claim is not cognizable" on habeas review.  McGuire v. Walsh, No. 09 Civ. 464 (ARR), 2010 WL 3420629, at *17 (E.D.N.Y. Aug. 26, 2010); accord

31

Rivas v. Fischer, 687 F.3d 514, 540 n.34 (2d Cir. 2012) (noting that the Supreme Court "has never explicitly recognized the existence of a freestanding actual innocence claim").

Assuming, arguendo, that a freestanding actual innocence claim is cognizable on habeas review, Washington would have to satisfy an "extraordinarily high" threshold of proof. House v. Bell, 547 U.S. 518, 554-55 (quoting Herrera, 506 U.S. at 417). To prevail, he would have to provide evidence establishing more than the degree of proof required by Schlup v. Delo, which is that, in light of the new evidence, it is "more likely than not" that "no reasonable juror could find him guilty beyond a reasonable doubt." Schlup, 513 U.S. 298, 327 (1995). Given this standard, it is "no wonder" that one prominent commentator has stated that "'[t]he chances that such a claim will ever succeed are extremely small.'" Ermichine v. United States, No. 06 Civ. 10208 (LAP) (JLC), 2011 WL 1842951, at *14 (S.D.N.Y. May 12, 2011) (Report & Rec. of Cott, Mag. J.) (quoting Wane R. LaFave, et al., 7 Crim. Proc. § 28.3(e) (3d ed. 2007)).

Here, as Justice Dawson observed in his decision, although Witnesses A and B each claimed to have witnessed the murder, they offered irreconcilable accounts of Washington's whereabouts and activities during the shooting. (See Ex. 12 at 16-17). Thus, Witness A testified that Washington was part of the group attacking Cabrera before X suddenly appeared and shot Cabrera. Witness B claimed, however, that Washington was a mere passive observer, who was not at all involved in the incident. Significantly, both of these witnesses' accounts also were at variance with Washington's own

testimony, which is that he had been walking back to his girlfriend's building when he heard the shots.

Justice Dawson also concluded that Witness C's testimony was not believable because the information that X allegedly provided to him was not corroborated by the trial evidence.  (Id. at 17).  For example, there was no evidence at trial that Cabrera wore a red bandana around his sneaker, as X allegedly told Witness C.  Witness C's account of multiple confessions by X also struck Justice Dawson as improbable.

While these were not the only reasons that Justice Dawson chose not to credit the testimony of Witnesses A, B, and C, they suffice to demonstrate that Washington cannot show that it is more likely than not that no reasonable juror could have found him guilty beyond a reasonable doubt, much less meet the higher standard that establishing a freestanding actual innocence claim would require.  In these circumstances, Washington is not entitled to habeas relief based on his claim of actual innocence.

III.   Conclusion

For the foregoing reasons, Washington's Second Amended Petition should be denied.  Furthermore, because Washington has not made the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

IV.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (e).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, United States District Judge, and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Batts.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

SO ORDERED.

Dated:      New York, New York
            March 29, 2013

_____
FRANK MAAS
United States Magistrate Judge

34

Copies to:

Calvin Washington
02-A-2339
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562

T. Charles Won
Assistant District Attorney
Office of the District Attorney, Bronx County
198 East 161st Street
Bronx, New York 10451